**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

**ANN M. SMITH,**

　　　　　　　　**Plaintiff,**

　　**v.**　　　　　　　　　　　**Civil Action 2:20-cv-1511
　　　　　　　　　　　　　　　　Judge Edmund A. Sargus
　　　　　　　　　　　　　　　　Magistrate Judge Kimberly A. Jolson**

**COMMISSIONER OF
SOCIAL SECURITY,**

　　　　　　**Defendant.**

## REPORT AND RECOMMENDATION

　　　Plaintiff, Ann M. Smith, brings this action under 42 U.S.C. § 405(g) seeking review of a final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB"). For the reasons set forth below, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision.

## I.　　BACKGROUND

　　　Plaintiff protectively filed her application for DIB on November 30, 2016, alleging that she was disabled beginning July 3, 2014. (Tr. 194–200). After her application was denied initially and on reconsideration, an Administrative Law Judge ("ALJ") held a hearing on January 4, 2019. (Tr. 39–81). On March 28, 2019, the ALJ issued a decision denying Plaintiff's application for benefits. (Tr. 12–38). The Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 1–6).

　　　Plaintiff filed the instant case seeking a review of the Commissioner's decision on March 24, 2020 (Doc. 1), and the Commissioner filed the administrative record on August 17, 2020 (Doc. 10). The matter is now ripe for consideration. (*See* Docs. 13, 15, 16).

Because Plaintiff's Statement of Errors (Doc. 15) pertains to only her physical impairments, the Undersigned limits her analysis of the hearing testimony and medical records to the same.

### A. Relevant Hearing Testimony

The ALJ summarized the testimony from Plaintiff's hearing:

> During the hearing and within the [Plaintiff]'s Function Report, she alleged deficits in her physical and emotional functioning. For instance, the [Plaintiff] testified she could stand for ten minutes, lift up to ten pounds, raise her upper extremities 90°, and move her neck less than 30° in each direction . . . . [f]urther, she reported difficulties with squatting, reaching, walking, sitting, and climbing stairs (Exhibit 3E).

(Tr. 21).

### B. Relevant Medical Evidence

The ALJ also usefully summarized Plaintiff's medical records and symptoms related to her physical impairments, beginning with records from 2014 and 2015:

> In terms of the [Plaintiff]'s alleged neck pain, she does have objective imaging studies that show the presence of an impairment. An MRI of the cervical spine from July 2014 showed degenerative disc disease, worst at C5/6 and C6/7 resulting in moderate central spinal canal narrowing and mild indentation on the ventral spinal cord at these levels (Exhibit 1F/2). A second MRI completed in December 2015 of the cervical spine revealed evidence of hardware at C5/6 and C6/7 with expected alignment and configuration; as well as a new disc bulge with endplate spurring central to right paracentral zone of C4/5 causing mild to moderate central canal stenosis and mild right neural foramina narrowing (Exhibits 1F/5, 2F/1, 12F/1, and 15F/13). The hardware findings are consistent with references in the record of the [Plaintiff] undergoing C5/6 and C6/7 fusion in January 2015, and fluoroscopy reports during the procedure. However, there are no records of that procedure or follow up with the surgeon, Dr. Awuor. (Exhibits 6F/1, 15F/10, 20, 47, and 108; 24F/3, 8, 11, 21, 29, 34, and 39; and 25F/10, 17, 25, and 32). Nevertheless, the record does contain numerous doctor visits for complaints of neck pain, including to her family practitioner, Jeffrey Haggenjos, D.O., a physiatrist, Brian Oricoli, M.D., and two neurosurgeons, Drs. Jeffrey Lobel, M.D. and Bradford Mullin.
>
> The first record subsequent to the procedure in January 2015 is to Dr. Oricoli on referral from Dr. Haggenjos. The [Plaintiff] reported neck pain radiating to her arm with tingling and numbness. On physical examination, the doctor reported

decreased range of motion of the cervical spine, tenderness to palpation, but full strength in the bilateral upper extremities without focal deficits, full and stable range of motion of the shoulders, elbows, and wrists without crepitus and normal tone. Dr. Oricoli prescribed Neurontin and Pennsaid, a topical ointment, for pain control. He strongly encouraged physical therapy, with the [Plaintiff] offering that her neck brace provided some gentle stretching of the neck muscles, and some improvement in pain (Exhibit 6F/l). Follow up appointments with Dr. Oricoli throughout 2015 demonstrated consistent physical examinations. The [Plaintiff] reported the Neurontin was effective for her dysesthesia, but she experienced drowsiness so could not take a full dose during the daytime, and she did not get the Pennsaid filled. Dr. Oricoli recommended getting authorization for a TENS unit that he thought would be helpful. In July 2015, the doctor reported effective use of the TENS unit with the [Plaintiff] reporting significant benefit in pain reduction to two on a scale of one to ten, ten being the worst pain (Exhibit 6F/3, 5, 7, and 9).

On December 8, 2015, the [Plaintiff] presented to Dr. Mullin on referral from Dr. Haggenjos. Dr. Mullin recommended the [Plaintiff] return to Dr. Awuor for evaluation given her x-rays looked good and he did not see her pre-operatively to even determine if she needed the surgery. He did recommend to Dr. Haggenjos that the [Plaintiff] have an MRI, and provided the [Plaintiff] with Dr. Awuor's address (Exhibit 15F/16).

(Tr. 22).

The ALJ then went on to discuss Plaintiff's medical records from 2016:

Following the MRI of cervical spine in December 2015, discussed above, the [Plaintiff] presented to Dr. Lobel, in March 2016, for reassessment of her neck pain. Initially, physician assistant, Julie Renner, PA, evaluated the [Plaintiff] noting on physical examination a well-healed anterior cervical incision on the right, pain to palpation of the deltoid muscles and biceps tendon on the left, but bilateral upper extremity strength of 5/5 with 4+/5 left shoulder abduction, normal gait, normal deep tendon reflexes of the bilateral upper extremities, and equivocal Phalen's on the left, and positive Tinel's bilaterally. Ms. Renner diagnosed right lateral disc herniation at C4/5 as seen on MRI, and bilateral carpal tunnel syndrome (Exhibit l5F/10 and 108).

Given the findings of carpal tunnel syndrome by Ms. Renner, the [Plaintiff] underwent an EMG of the bilateral upper extremities in April 2016 that demonstrated early/very mild median neuropathy at the bilateral wrists, and evidence for mild right CS radiculopathy, but no evidence of peripheral neuropathy (Exhibit 15F/97 and 103).

Follow up with Dr. Lobel in June 2016 for reassessment of the [Plaintiff]'s neck and shoulder pain showed subjective tenderness to light-touch on the right aspect of her neck, right upper extremity tenderness to palpation, and some difficulty with

external rotation in the right shoulder. However, no evidence of wasting in either the thenar or hyperthenar eminence, negative Spurling sign bilaterally in the upper extremities, no Hoffman's sign, no pathologic reflexes, and no crepitus of the cervical spine. Dr. Lobel noted the [Plaintiff] presented as very concerned that something was wrong with her neck, despite radiographic imaging by MRI showing the spinal instrumentation was very well placed and the decompression was quite satisfactory. He did not recommend any treatment regarding her neck, but indicated that her pain could be related to a rotator cuff injury from 2008 that required surgical intervention. Interestingly, this neurosurgeon also recommended the [Plaintiff] be reevaluated by her original surgeon, Dr. Awuor (Exhibit l5F/7 and 111).

The [Plaintiff] then switched her focus to her lumbar spine, when in July 2016 she presented to Dr. Haggenjos with complaints of severe right sciatic nerve pain. Prior to this date, physical examinations showed full range of motion of the lumbar spine, normal gait, and negative straight leg raise (Exhibit 6F/l, 5, 9, 11, and 13). At this time, physical examination showed decreased range of motion of the lumbar spine with the inability to move right or left more than 3 degrees, and radiation to the right lower extremity. Dr. Haggenjos recommended transfer to the hospital by ambulance (Exhibit 18F/45).

At Fairfield Medical Center, a lumbar spine x-ray showed moderate degenerative disc disease at L5/Sl and to a lesser extent at L4/5 (Exhibits 10F/27, 15F/71, and 23F/45). An MRI of the lumbar spine revealed her bony spinal canal overall is congenitally small, disc and osteophytes as well as facet and ligamentum flavum hypertrophy contribute to further stenosis of the thecal sac and narrowing of the neural foramina; and disc extrusion extending posteriorly and inferiorly toward the right from L4/5 with narrowing of the right neural foramen (Exhibits 10F/24 and 28, 15F/79, and 23F/46). Orthopedic surgeon, F. Paul DeGenova D.O., performed a microdiscectomy at L4/5 on the right on July 15, 2016 (Exhibits 3F/1 and 17, 14F, and 15F/64). This appears to have been successful because the record does not document any more complaints of back issues or follow up with Dr. DeGenova. In fact, a request for medical records from Dr. DeGenova's office noted the [Plaintiff] had not been seen in the office and records should be requested from the hospital (Exhibit 8F).

Three days after her discharge from the hospital, on July 20, 2016, the [Plaintiff] presented to Dr. Haggenjos for follow up on her cervical issues. Dr. Haggenjos diagnosed a neck sprain and indicated the [Plaintiff] had an appointment to see Dr. Awuor in August 2016 (Exhibit 18F/44). Although the record contains a letter to the [Plaintiff] indicating that she had an appointment with Dr. Awuor on August 17, 2016 (Exhibit 15F/62), there is no indication in the record that the [Plaintiff] actually saw Dr. Awuor in August 2016. In fact, the [Plaintiff] returned to Dr. Haggenjos on August 18, 2016 without any indication by the doctor or the [Plaintiff] that she saw Dr. Awuor the day before (Exhibits 10F/19 and 18F/42). Moreover, in October 2016, the [Plaintiff] returned to Dr. Mullin who indicated

4

that she had not seen her original surgeon (Dr. Awuor) (Exhibits 4F/l, 5F/2, 15F/3 and 40, and 22F/1).

At the appointment with Dr. Mullin, he noted on physical examination normal motor strength in all by [sic] one muscle group, normal muscle tone and bulk, and normal gait and posture, but decreased range of motion of the cervical spine, and decreased reflexes. He indicated that her MRI of the cervical neck showed disc protrusion at C4/5 with fusion as an option, but he was not certain that would improve her neck pain. He recommended that she continue with pain management at this point (Exhibits 4F, 5F, 15F/2 and 40, and 22F/1).

Therefore, the [Plaintiff] returned to Dr. Oricoli on October 25, 2016 after not treating with him since May 23, 2016. The doctor noted the [Plaintiff]'s consult with Dr. Mullin where he discussed cervical fusion not being the best option. Further, Dr. Oricoli reported that a physician with workers' compensation determined the [Plaintiff] had met maximum medical improvement and discontinued her medications. His physical examination revealed intact sensation to light touch in all extremities, normal coordination in all extremities, full strength in the bilateral upper extremities, full/stable range of motion at the shoulders, elbows, and wrists bilaterally without crepitus. Additionally, the [Plaintiff] transitioned from seated to standing position smoothly, ambulated with a normal narrow based tandem gait pattern without any antalgic quality, and had near full lumbar range of motion in all realms. However, she demonstrated limited cervical range of motion, and tenderness to palpation and muscle tension along the midline lower cervical paraspinal muscles and along the superior border of the trapezius bilaterally. Dr. Oricoli recommended cervical epidural steroid injections; but there was a delay in the approval request given evidence of a stable fusion at C5-7 (Exhibit 6F/19).

(Tr. 23–24).

Moving chronologically, the ALJ next discussed Plaintiff's treatment records from 2017:

The [Plaintiff] continued to follow monthly with Dr. Haggenjos only, from November 2016 through March 2017. He continued to diagnose neck sprain and recommend home exercises, as she did not have coverage through workers' compensation for medication. However, at her visit in March 2017, Dr. Haggenjos prescribed Motrin and Flexeril for the [Plaintiff]'s neck sprain (Exhibits 10F/10 and 18F/29).

This treatment appears to have been successful because the [Plaintiff] did not return to any physician for four months when she returned to Dr. Haggenjos in July 2017. At that time, she requested a referral to a Dr. Gideon. Her physical examination showed decreased cervical spine range of motion, otherwise normal. Dr. Haggenjos

planned to get the forms needed to refer the [Plaintiff] to Dr. Gideon for her neck issues, and recommended follow up with Dr. Oricoli (Exhibit 18F/25).

In August 2017, a radiology report indicated the [Plaintiff] received a cervicothoracic junction injection by Dr. Oricoli; however, there are no procedure notes regarding this procedure or follow up with Dr. Oricoli (Exhibit 18F/65). However, this procedure appears to have been successful because the [Plaintiff] did not present to any physician for her neck pain for eight months.

(Tr. 24–25).

The ALJ then proceeded to discuss Plaintiff's 2018 medical records:

The [Plaintiff] returned to Dr. Haggenjos in April 2018 for follow up of her neck pain, but reporting a 0/10 pain level. Further, the doctor reported a completely normal physical examination, and recommended follow up in three months (Exhibit 18F/21).

However, the following month the [Plaintiff] returned with complaints of increased pain and examination revealing decreased range of motion, crepitus, and point tenderness. Dr. Haggenjos continued the [Plaintiff]'s Motrin, and requested forms to order a cervical MRI and physical therapy (Exhibit 18F/19).

The record reflects that from June 25, 2018 through July 25, 2018, the [Plaintiff] attended seven sessions of physical therapy with the therapist noting improvement in bilateral upper extremity muscle strength, but continued reports of pain and decreased cervical range of motion (Exhibit 18F/60).

(Tr. 25).

The ALJ then focused his discussion on treatment records pertaining to Plaintiff's neuropathy and carpal tunnel:

As discussed above, in April 2016, the [Plaintiff] underwent an EMG that showed early/very mild median neuropathy at the bilateral wrists consistent with carpal tunnel syndrome (Exhibit 15F/97-l 00). Following this procedure, the record only reflects two office visits pertaining to follow up regarding carpal tunnel syndrome. In January 2017, the [Plaintiff] presented to Dr. Haggenjos for follow up on her various issues including carpal tunnel syndrome. The doctor did not note any findings on physical examination consistent with carpal tunnel syndrome, nor did he provide any treatment for this issue (Exhibit 18F/32).

The following month, the last time mentioning carpal tunnel as a complaint, the doctor noted a normal physical examination with only positive Tinel's bilaterally. He continued the [Plaintiff]'s Motrin with no request for follow up (Exhibit l8F/31).

6

(*Id.*)

Next, the ALJ turned to treatment records for Plaintiff's knee issues:

The [Plaintiff] also alleged left knee issues as disabling. The record indicated that in February 2016, she presented to Dr. Haggenjos with complaints of left knee pain and swelling for two weeks after slipping on ice. The doctor referred the [Plaintiff] to an orthopedic physician and ordered a hinged knee brace (Exhibit 18F/52).
The next time the [Plaintiff] complained of knee pain was over one and half years later when in November 2017, she returned to Dr. Haggenjos with complaints of left knee pain after another fall four days earlier. Again, the doctor ordered a knee brace (Exhibit 18F/23).

Two months later, she returned to Dr. Haggenjos with continued complaints of knee pain. He noted the [Plaintiff] did not have the knee brace as ordered. At this visit, the doctor ordered an x-ray of the left knee and re-ordered the knee brace (Exhibit 18F/22). The x-ray showed moderate degenerative joint disease (Exhibits 18F/61 and 25F/11 and 14).

In April 2018, upon referral from Dr. Haggenjos, the [Plaintiff] presented to Dr. Finck, an orthopedic surgeon, for evaluation of her left knee pain. The doctor noted the [Plaintiff] demonstrated tenderness in the patellar tendon, patella, lateral joint line, and medial joint line with decreased range of motion in flexion on physical examination. However, Lachman, drawer varus, and valgus testing were negative with only patellar apprehension positive. Additionally, he reported normal sensation, present pulses, and no apparent effusion, but moderate swelling, and mild crepitus. Dr. Finck recommended obtaining an MRI of the left knee, and continued use of the hinged knee brace, as well as Motrin and ice for swelling (Exhibit 25F/19).

The MRI of the left knee on April 25, 2019 revealed a small tear of the posterior horn medial meniscus extending to the superior articulating surface, moderate degenerative changes most pronounced at the medial joint space with associated chondrosis medial joint space near the apex posterior patellar facet noted. Additionally, increased signal of the popliteus tendon suggesting low-grade tendinopathy, and a small joint effusion. The doctor informed the [Plaintiff] of the results and scheduled left knee arthroscopy (Exhibit 25F, 23, 26, and 29).

The [Plaintiff] underwent the proposed surgery in June 2018 by Dr. Finck, which included left knee arthroscopy with partial medial [meniscectomy]; left knee arthroscopy with chondroplasty of the patella, LFC, and MFC (Exhibit 24F/l l). The [Plaintiff] followed up post surgically with Dr. Finck on three occasions, 10 days, six weeks, and ten weeks post-operatively. On September 6, 2018, the ten-week visit, Dr. Finck noted the [Plaintiff] as progressing well with significant improvement in her preoperative symptoms. Although she continued to have

swelling in the knee and left lower extremity with activity, the doctor recommended weight bearing and increase activity (Exhibit 24F/40).

Moreover, the record indicated the [Plaintiff] requested weight loss instructions and discussed issues with her weight with Dr. Haggenjos given her over 30 body mass index considered obese by the Centers for Disease Control and Prevention and SSR 02-1p (Exhibits 3F, 5F, 6F, l0F, 14F, 15F, 18F, 19F, and 20F).

(Tr. 25–26).

### C. The ALJ's Decision

The ALJ found that Plaintiff meets the insured status requirement through December 31, 2019, and had not engaged in substantial gainful employment since her alleged onset date of July 3, 2014. (Tr. 17). The ALJ determined that Plaintiff has the following severe impairments: carpal tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, degenerative joint disease of the left knee, status post meniscus tear and chondromalacia with arthroscopy, partial medial meniscectomy, and chondroplasty, obesity, and major depressive disorders. (Tr. 18). The ALJ, however, found that none of Plaintiff's impairments, either singly or in combination, met or medically equaled a listed impairment. (*Id.*).

As to Plaintiff's residual functional capacity ("RFC"), the ALJ opined:

After careful consideration of the entire record, [the ALJ] find[s] that that the [Plaintiff] has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except she can:

- Perform work that can generally be done while sitting or standing, with the option to alternate between sitting and standing at will, while remaining on task and at the workstation;
- Occasionally stoop, crouch, and climb stairs or ramps, but never kneel or crawl;
- Frequently handle, finger and feel, bilaterally;
- Never reach above shoulder level;
- Occasionally flex, extend, and rotate the neck, but never more than 30°;
- Never be exposed to industrial vibration;

- Never be exposed to workplace hazards (such as ropes, ladders, scaffolds, unprotected heights, moving mechanical parts, or hazardous machinery);

- Engage in occasional interaction with supervisors, co-workers, and the public;

- Engage in simple duties, defined as those that can be learned within 30 days, and that require little or no judgment to perform;

- Engage in predictable work activity, defined as that with only occasional changes in the work setting or general nature of the tasks performed; and

- Engage in no production-paced tasks, such as assembly line work, or fast food work.

(Tr. 20–21).

Upon "careful consideration of the evidence," the ALJ found that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms are not entirely consistent with the medical evidence and other evidence and other evidence in the record for the reasons explained in this decision." (Tr. 21–22).

The ALJ then turned to the opinion evidence. She began with the opinion of Plaintiff's treating physician, Dr. Jeffrey Haggenjos, who opined that Plaintiff "could not work." (Tr. 27). The ALJ afforded his opinion "limited weight," explaining that the opined limitations were "out of proportion with the objective medical evidence contained in the record[,] and there is no evidence of an examination by Dr. Haggenjos that would support such limitations." (Tr. 28). The ALJ then considered the opinion of Plaintiff's other treating physician, Dr. Brian Oricoli, who opined, along with additional physical restrictions, that Plaintiff demonstrated physical abilities at the sedentary physical demand level. (*Id.*). The ALJ afforded Dr. Oricoli's opinion "little weight," explaining that it "was provided more than three years before [Plaintiff's] hearing[,] and evidence received at the hearing level and discussed in this decision suggest [Plaintiff] is not as limited as determined by the doctor." (*Id.*).

9

Relying on the Vocational Expert's ("VE"), the ALJ concluded that Plaintiff was unable to perform her past relevant work as a stock clerk, but could perform jobs that exist in significant numbers in the national economy, such as an assembler of communications equipment, an assembler of plastic hospital products, and a hand packager, (Tr. 30–31). Thus, the ALJ concluded that Plaintiff "has not been under a disability, as defined in the Social Security Act, from July 3, 2014, through the date of this decision (20 CFR 404.1520(g))." (Tr. 32).

## II.     STANDARD OF REVIEW

The Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see also* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994)).

"After the Appeals Council reviews the ALJ's decision, the determination of the council becomes the final decision of the Secretary and is subject to review by this Court." *Olive v. Comm'r of Soc. Sec.*, No. 3:06 CV 1597, 2007 WL 5403416, at *2 (N.D. Ohio Sept. 19, 2007) (citing *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990); *Mullen v. Bowen*, 800 F.2d 535, 538 (6th Cir. 1986) (*en banc*)). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, "even if a reviewing court would decide the matter differently." *Id.* (citing 42 U.S.C. § 405(g); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059–60 (6th Cir. 1983)).

## III.    DISCUSSION

Plaintiff raises three assignments of error. To begin, she asserts that the ALJ improperly

weighed the opinion of her treating physician, Dr. Jeffrey Haggenjos. (Doc. 15 at 5–9). Next, Plaintiff contends the ALJ erred at Step 2 by failing to find Plaintiff's migraines and neuropathy as medically determinable impairments. (*Id.* at 9–12). Finally, Plaintiff asserts that the ALJ erred at Step 3 by failing to find that her degenerative disc disease of the cervical spine meets or equals the requirements of Listing 1.04A. (*Id.* at 12–17).

### A. Treating Physician Opinions

The Court begins with the ALJ's discussion of Dr. Haggenjos' opinion. Two related rules govern how the ALJ was required to analyze the opinions of Plaintiff's treating physicians.[1] *Dixon v. Comm'r of Soc. Sec.*, No. 3:14-cv-478, 2016 WL 860695, at *4 (S.D. Ohio Mar. 7, 2016). The first is the "treating physician rule." *Id.* The rule requires an ALJ to "give controlling weight to a treating source's opinion on the issue(s) of the nature and severity of the claimant's impairment(s) if the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record." *LaRiccia v. Comm'r of Soc. Sec.*, 549 F. App'x 377, 384 (6th Cir. 2013) (internal quotation marks omitted) (citing 20 C.F.R. § 404.1527(c)(2))

Closely associated is "the good reasons rule," which requires an ALJ to give "good reasons . . . for the weight given to the claimant's treating source opinion." *Dixon*, 2016 WL 860695, at *4 (alterations in original (quoting *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009)); *see also* 20 C.F.R. § 404.1527(c)(2); *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 550–51 (6th Cir. 2010). To meet the "good reasons" standard, the ALJ's determination "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to

---

[1] On January 18, 2017, the agency published final rules titled "Revisions to Rules Regarding the Evaluation of Medical Evidence." 82 Fed. Reg. 5844. These final rules, among other things, significantly changed the standards for evaluating medical opinions. Because the new standards for evaluating medical opinions are effective for claims filed on or after March 27, 2017, they do not apply here.

the treating source's medical opinion and the reasons for that weight." *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases, particularly in situations where a claimant knows that her physician has deemed her disabled and therefore "might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied . . . " *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (internal citation and quotation marks omitted). The requirement also ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule. *Id*. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' we have held that an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and explaining precisely how those reasons affected the weight' given 'denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified upon the record.'" *Blakely*, 581 F.3d at 407 (alterations in original) (quoting *Rogers*, 486 F.3d at 243). The treating physician rule and the good reasons rule together create what has been referred to as the "two-step analysis created by the Sixth Circuit." *Allums v. Comm'r of Soc. Sec*., 975 F. Supp. 2d 823, 832 (N.D. Ohio 2013).

Plaintiff asserts that the ALJ erred in two ways with regard to Dr. Haggenjos' opinion. To start, she contends that the ALJ "cherry-picked" the record to discount Dr. Haggenjos' opinion. (*See generally* Doc. 15 at 6–9). Additionally, she asserts that the ALJ failed to consider the relevant regulatory factors when weighing the opinion. (*See id*.). As explained below, the Undersigned disagrees on both points.

Dr. Haggenjos completed several forms regarding Plaintiff's prognosis. In December 2016, he completed a form listing Plaintiff's diagnoses, noting that she "will need surgery," and that she was "unable to work." (Tr. 376–77). He provided no narrative support for these conclusions, instead attaching raw data and test results. (*See id*.). He completed the same form in May 2017, providing the same two to three-word answers, and concluding Plaintiff was "unable to work." (Tr. 390–91). In September 2016, Dr. Haggenjos opined in a letter that: her cervical range of motion was "morbidly different"; "[s]he would be hard pressed to even drive a car"; "the use of her right upper extremity is in question"; "[s]he would not be able to perform simple tasks, let alone complex ones"; and "her pain is still a major problem with any attempt to use her neck,[which] would preclude work as she has a hard time doing minimal chores around the house." (Tr. 662).

The ALJ said the following about Dr. Haggenjos' opinions:

[Plaintiff]'s treating physician, Dr. Haggenjos provided several Treating Source Statements, concluding that the [Plaintiff] could not work without a functional analysis (Exhibits 12E, l4E, 7F, 10F, l5F, and l 8F). Generally, more weight is afforded to the opinion of a treating source as the treating source is most often in the best position to provide a detailed, longitudinal picture of the [Plaintiff]'s medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings or one time examinations (20 CFR 404.1527). If a treating sources' medical opinion is well supported and consistent with the other substantial evidence in the case record, it must be given controlling weight (20 CFR 404.1527). When a treating source opinion is not afforded controlling weight, the following factors will be considered: the length of the treatment relationship and the frequency of treatment, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion, any relevant specialty of the treating source, and other relevant factors (20 CFR 404.1527). While I have given the opinion appropriate consideration, Dr. Haggenjos' opinion is given limited weight because the limitations identified by the doctor are out of proportion with the objective medical evidence contained in the record and there is no evidence of an examination by Dr. Haggenjos that would support such limitations. Moreover, the issue of disability is reserved to the Commissioner (20 CFR 404.1527(e)(2)).

(Tr. 27–28).

For support of her "cherry-picking" argument, Plaintiff cites Dr. Haggenjos' treatment records containing numerous diagnoses of neck and spine impairments. (Doc. 15 at 7). Additionally, she cites the opinion of her other treating physician, Dr. Brian Oricoli, that she says, "clearly aligns with and supports the opinion of Dr. Haggenjos." (*Id*.). She also cites other treatment notes documenting "chronic neck pain; back pain; neuropathy; radiculopathy; numbness; tingling; and limited range of motion, even after surgical intervention and multiple treatment modalities." (*Id*. at 8 (citing Tr. 354, 356, 358, 360, 362, 364, 366, 368, 370, 373, 411)).

But the ALJ discussed many of these records, among others potentially favorable to Plaintiff. For example, the ALJ noted that Dr. Haggenjos referred Plaintiff to several physicians. (Tr. 22). The ALJ additionally discussed abnormal findings from Plaintiff's examinations. (Tr. 21–23 (citing Tr. 354, 356, 358, 360, 362)). Further, the ALJ noted that, in July 2016, Dr. Haggenjos recommended that Plaintiff be transported to the hospital in an ambulance. (Tr. 23 (citing Tr. 706)). The ALJ noted that Plaintiff was discharged three days later and followed up with Dr. Haggenjos, who diagnosed her with a neck sprain. (Tr. 23 (citing Tr. 705)). She went on to explain that from November 2016 through March 2017, Plaintiff had monthly appointments with Dr. Haggenjos for her neck sprain and that Dr. Haggenjos prescribed medication and recommended home exercises. (Tr. 24 (citing Tr. 690, 693, 699)). And the ALJ noted that, by April 2018, Plaintiff reported a 0/10 pain level to Dr. Haggenjos, and his treatment notes documented a normal physical exam. (Tr. 25 (citing Tr. 682)). The ALJ noted that the next month, however, Plaintiff reported increased pain, so Dr. Haggenjos prescribed medication, ordered testing, and recommended physical therapy. (*Id*. (citing Tr. 680)). As the ALJ noted, Plaintiff had a normal examination the next month. (*Id*. (citing Tr. 678)).

14

The foregoing demonstrates that the ALJ did not cherry-pick the record to discount Dr. Haggenjos' opinion.  "Rather than describing the ALJ's actions as 'cherry-picking,' the Sixth Circuit has explained that it could be more neutrally described as 'weighing the evidence.'"  *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio Mar. 11, 2013) (quoting *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)).  That is what the ALJ did here, so Plaintiff has shown no reversible error in this regard.

Plaintiff additionally contends that the ALJ violated the treating physician rule because she did not discuss the relevant regulatory factors.  (Doc. 15 at 8–9).  As noted, these factors include: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the source; and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 416.927(c).

But the regulations simply "instruct an ALJ to consider these factors" and "include 'good reasons . . . for the weight give[n] [to the] treating source's opinion."  *Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011).  The ALJ is not required to engage in "an exhaustive factor-by-factor analysis."  *Id.*  Still, the ALJ's opinion shows that she considered these relevant factors when addressing Dr. Haggenjos' treatment of Plaintiff.  To begin, the ALJ acknowledged that Dr. Haggenjos was Plaintiff's treating physician and had been treating her since 2015.  The ALJ also noted that Plaintiff saw Dr. Haggenjos monthly between November 2016 and March 2017.  (Tr. 24).  On top of that, and as discussed above, the ALJ considered the evidence of record and found that Dr. Haggenjos' opinions were disproportionate with the objective medical evidence.  (Tr. 21–28).

It does not matter that that the ALJ considered these factors and the relevant evidence before assigning specific weight to Dr. Haggenjos' opinion.  Rather, "it is proper to read the ALJ's decision as a whole," and "it would be a needless formality to have the ALJ repeat substantially similar factual analyses in different parts of the decision."  *Mausser v. Saul*, No. 3:19-CV-2055 JGC, 2020 WL 7043127, at *1 (N.D. Ohio Nov. 30, 2020) (quotation marks and citation omitted).  And in reading her decision as a whole, it is clear that the ALJ considered the relevant regulatory factors and objective medical evidence when weighing Dr. Haggenjos' opinion.  So Plaintiff has failed to show reversible error on this point, too.

## B.  Migraines and Neuropathy

Plaintiff next asserts that the ALJ failed to recognize her migraines and neuropathy as medically determinable impairments.  (*See generally* Doc. 15 at 9–12).  As a result, she says the ALJ failed to account for them in the RFC.  (*See id*.).

At step two, the ALJ must consider whether Plaintiff's alleged impairments constitute "medically determinable" impairments.  *See* 20 C.F.R. §§ 404.1508; 416.920(a)(4)(iii); 404.1520(a)(4)(iii).  A medically determinable impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques," and "must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [the claimant's] statement of symptoms."  20 C.F.R. §§ 404.1508; 416.908.  Additionally, an impairment must meet the durational requirement, meaning, "it must have lasted or must be expected to last for a continuous period of at least 12 months."  20 C.F.R. § 404.1509.  "If an alleged impairment is not medically determinable, an ALJ need not consider that impairment in assessing the RFC."  *Jones v. Comm'r of Soc. Sec.*, No. 3:15-cv-00428, 2017 WL 540923, at *6 (S.D. Ohio Feb. 10, 2017).

*1. Neuropathy*

The ALJ's assessment of Plaintiff's neuropathy can be dealt with in short order.  The ALJ

expressly considered that impairment and its effect on her ability to work.  She considered her

neuropathy in tandem with her carpal tunnel, which is a form of neuropathy, *see Huffstetler v.*

*Saul*, No. 3:18-CV-210-DCP, 2019 WL 4752270, at *4 (E.D. Tenn. Sept. 30, 2019), and found it

to be a severe impairment.  (Tr. 18).  The ALJ explained, however, that her neuropathy and carpal

tunnel seemed to be well managed:

> Given the findings of carpal tunnel syndrome by Ms. Renner, the [Plaintiff]
> underwent an EMG of the bilateral upper extremities in April 2016 that
> demonstrated early/very mild median neuropathy at the bilateral wrists, and
> evidence for mild right CS radiculopathy, but no evidence of peripheral neuropathy
> (Exhibit 15F/97 and 103).

(Tr. 23).

> As discussed above, in April 2016, the claimant underwent an EMG that showed
> **early/very mild** median neuropathy at the bilateral wrists consistent with carpal
> tunnel syndrome (Exhibit 15F/97–100).  Following this procedure, the record only
> reflects two office visits pertaining to follow up regarding carpal tunnel syndrome.
> In January 2017, the claimant presented to Dr. Haggenjos for follow up on her
> various issues including carpal tunnel syndrome.  The doctor did not note any
> findings on physical examination with carpal tunnel syndrome, nor did he provide
> any treatment for this issue (Exhibit 18F/32).
>
> The following month, the last time mentioning carpal tunnel as a complaint, the
> doctor noted a normal physical examination with only positive Tinel's bilaterally.
> He continued the claimant's Motrin with no request for follow up. (Exhibit 18F/31).

(Tr. 25) (emphasis in original).

Thus, regardless of whether the ALJ explicitly designated her neuropathy as a medically

determinable or severe impairment, the ALJ considered these impairments when assessing the

medical evidence and deciding how her impairments impacted her ability to work.  *See, e.g.*,

*Huffstetler*, 2019 WL 4752270, at *4 (finding no error despite ALJ's failure to designate plaintiff's

carpal tunnel as a medically determinable or severe impairment where the ALJ discussed plaintiff's

carpal tunnel considered its impact on plaintiff's ability to work). Plaintiff has failed to show reversible error as a result.

    *2. Headaches*

    As the Commissioner recognizes, the ALJ did not discuss Plaintiff's complaints of headaches. But Plaintiff relies on only her hearing testimony and subjective reports of headaches. (*See* Doc. 15 at 11). And these records alone do not establish a medically determinable impairment. *See, e.g.*, *Stewart v. Comm'r of Soc. Sec.*, No. 2:17-CV-706, 2018 WL 1980254, at *3–4 (S.D. Ohio Apr. 27, 2018) (finding that the ALJ did not err by failing to designate plaintiff's migraines as medically determinable impairment where "there [was] no objective medical evidence or medical opinion diagnosing the cause of the headaches or opining that plaintiff's ability to work would be impaired by his headaches[,] [p]laintiff never sought treatment for headaches alone; his reports concerning headaches occurr[ed] in the context of receiving treatment for some other medical problem").

    More importantly, it appears that the ALJ did attempt to accommodate her headaches. The records upon which Plaintiff relies show that her headaches were associated with her neck pain. (*See, e.g.*, Tr. 699 ("[P]atient reports to [Dr. Haggenjos] today for a [Bureau Workers Compensation] neck injury. She rates her pain a 6/10 today. She has had a headache with neck pain for 2 days."). The ALJ thoroughly discussed Plaintiff's neck pain and specifically accommodated for her neck impairment in the RFC. (Tr. 21). Plaintiff does not explain how those accommodations fail to accommodate her headaches. Nor does she propose alternative accommodations that would. It is her burden to do so. *See, e.g.*, *McDaniel v. Comm'r of Soc. Sec.*, No. 2:15-CV-12507, 2017 WL 9472894, at *3–4 (E.D. Mich. Feb. 7, 2017), *report and recommendation adopted sub nom. McDaniel v. Berryhill*, No. 15-12507, 2017 WL 1371097 (E.D.

Mich. Apr. 17, 2017) (finding no error in the ALJ's failure to discuss her headaches because she "did not explain" how the ALJ's RFC inadequately addressed that impairment).  And because the ALJ "accommodate[ed] [P]laintiff's neck pain, the ALJ also accommodated the alleged cause of [P]laintiff's headaches." *Stewart v. Comm'r of Soc. Sec.*, No. 2:17-CV-706, 2018 WL 1980254, at *3–4 (S.D. Ohio Apr. 27, 2018)

In sum, the ALJ did not err with regard to Plaintiff's neuropathy or headaches, and remand is not warranted.

## C. Listing 1.04A

Finally, Plaintiff asserts that the ALJ erred in finding that her impairments did not satisfy the requirements of Listing 1.04A.  (Doc. 15 at 13–17).  The Undersigned disagrees.

To meet all qualifications of Listing 1.04A, Plaintiff must demonstrate: a spinal disorder resulting in the compromise of a nerve root or the spinal cord; nerve root compression characterized by neuro-anatomic distribution of pain; limitations in the motion of the spine; motor loss (atrophy with associated muscle weakness); sensory or reflex loss; and evidence of a positive straight-leg raising test (sitting and supine).  20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D). Plaintiff also notes additional requirements of an inability to perform fine and gross motor movements effectively or ambulate effectively as a result of the impact of her conditions, (Doc. 15 at 14), but it appears that Plaintiff is referring to Listing 1.04C.  Unlike Listing 1.04C, Listing 1.04A does not include those additional requirements.  *See Irvin v. Comm'r of Soc. Sec.*, No. 1:12-cv-837, 2013 WL 3353888, at *10, f. 8 (S.D. Ohio July 3, 2013) (distinguishing between the two Listings).  As Plaintiff only contends that the ALJ erred with regard to Listing 1.04A, the Undersigned considers only that Listing.

"Plaintiff cannot satisfy the Listing unless she can prove all of the criteria are present."

*Bianchetti v. Comm'r of Soc. Sec.*, No. 1:17-CV-155-SKL, 2018 WL 3873577, at *4 (E.D. Tenn. Aug. 15, 2018) (citing *Hale v. Sec'y of H.H.S.*, 816 F.2d 1078, 1086 (6th Cir. 1987)). "'An impairment that manifests only some of [the] criteria, no matter how severely, does not qualify.'" *Bianchetti*, 2018 WL 3873577, at *4 (alteration in original) (quoting *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990)). Additionally, "'[b]ecause satisfying the listings yields an automatic determination of disability . . . the evidentiary standards [at step three] . . . are more strenuous than for claims that proceed through the entire five-step evaluation.'" *Bianchetti*, 2018 WL 3873577, at *4 (alterations in original) (quoting *Peterson v. Comm'r of Soc. Sec.*, 552 F. App'x 533, 539 (6th Cir. 2014)). Finally, "[b]ecause abnormal physical findings may be intermittent, their presence over a period of time must be established by a record of ongoing management and evaluation.'" *Bianchetti*, 2018 WL 3873577, at *4 (alteration in original) (quoting 20 C.F.R. Part 404, Subpart P, Appendix 1, § 1.00(D)).

Beginning with the first requirement, "compromise of the nerve root or spinal cord," Plaintiff relies on an MRI of the cervical spine that revealed: degenerative disc disease worst at C5-C7 and C-7 resulting in moderate central spinal canal narrowing and mild indentation of the ventral spinal cord at these levels. (Doc. 15 at 13 (citing Tr. 302)). The Court, as does Defendant, assumes that "mild indentation of the ventral spinal cord" is a "compromise of the nerve root or spinal cord." Plaintiff also cites evidence of neuro-anatomic distribution of pain. (*Id*. at 13). As noted, however, Plaintiff must also present evidence of limitations in the motion of the spine and motor loss (atrophy with associated muscle weakness), as well as sensory or reflex loss and evidence of a positive straight-leg raising test (sitting and supine).

Regarding motor loss, Plaintiff cites records showing muscle weakness. (*Id*.). But "motor loss required by Listing 1.04 (A) is not the same as mere muscle weakness." *Crawford v. Comm'r*

*of Soc. Sec.*, No. 2:18-CV-480, 2019 WL 850736, at *5 (S.D. Ohio Feb. 22, 2019), *report and recommendation adopted*, No. 2:18-CV-480, 2019 WL 2414676 (S.D. Ohio June 7, 2019) (quotation marks and citation omitted).  "Rather, to demonstrate motor loss as required by Listing 1.04, a claimant must demonstrate atrophy associated with muscle weakness[.]"  *Id.*  None of the records upon which Plaintiff relies shows muscle atrophy associated with muscle weakness.  (*See, e.g.*, Tr. 348 (noting giveaway weakness but normal muscle tone and bulk); Tr. 444 (same)).  So Plaintiff has failed to present evidence satisfying all of the criteria of Listing 1.04(A).

Moreover, it is worth noting Plaintiff has failed to establish that her impairment lasted or was expected to last for at least a continuous period of at least twelve months.  *Dugan v. Comm'r of Soc. Sec.*, No. 2:17-CV-895, 2018 WL 4214389, at *5 (S.D. Ohio Sept. 5, 2018), *report and recommendation adopted*, No. 2:17-CV-895, 2018 WL 4761573 (S.D. Ohio Oct. 2, 2018) (citing *Sistrunk v. Comm'r of Soc. Sec.*, No. 1:17-cv-1771, 2018 WL 3126582, at *12 (N.D. Ohio June 26, 2018) (collecting cases holding that "only occasional or intermittent findings of Listing 1.04 requirements are insufficient")).

For example, in May 2015, Plaintiff's sensation was intact, her muscle stretch reflexes were equal and there was no muscle atrophy.  (Tr. 354).  There was tenderness to palpation along her cervical paraspinal muscles and trapezius, but her strength examination was full and without focal deficits.  (Tr. 361).  Similar findings were noted throughout 2015 and 2016.  (Tr. 357, 359, 360–61, 363, 365, 367, 369, 371, 372–73).  In June 2016, Plaintiff's decompression was "quite satisfactory."  (Tr. 552).  In October 2016, Plaintiff had "giveaway weakness," diminished reflexes and decreased range of motion.  (Tr. 481).  Yet, she had normal muscle tone.  (*Id.*).  And, several months earlier, in July 2016, Plaintiff's motor strength testing, sensory, and reflexes were normal.  (Tr. 513, 527).  In May 2017, Plaintiff's strength testing showed inconsistent giveaway weakness

with pain in both shoulders secondary to neck pain.  (Tr. 422, 425).  Her strength in other muscle groups, however, was normal and she had no muscle atrophy.  (Tr. 422, 426).  Her sensory exam revealed diffuse paresthesia but her tendon reflexes were normal.  (Tr. 423).  In 2018, Plaintiff exhibited decreased range of motion and exhibited tenderness but there were no other findings.  (Tr. 676, 680, 853, 863).

So while Plaintiff experienced some of the Listing's criteria, these symptoms "scattered over time, wax[ed] and wan[ed]," and often, were "present on one examination but absent on another[.]"  *Boles v. Berryhill*, No. 2:16-CV-00059, 2017 WL 3116435, at *5 (M.D. Tenn. July 21, 2017), *report and recommendation adopted sub nom. Boles v. Soc. Sec. Admin.*, No. 2:16-CV-00059, 2017 WL 3671367 (M.D. Tenn. Aug. 8, 2017) (quoting SSAR 14-1(4), 80 FR 57418-02, 57420, (S.S.A., Sept. 23, 2015)).  Consequently, she has failed to satisfy the Listing's "duration requirement," which mandates "the simultaneous presence of all the medical criteria in paragraph A [] to continue, or be expected to continue, for a continuous period of at least 12 months."  *Boles*, 2017 WL 3116435, at *5 (quoting SSAR 14-1(4), 80 FR 57418-02, 57420, (S.S.A., Sept. 23, 2015)).

Finally, the Undersigned need not address Plaintiff's argument that the ALJ failed to satisfy the Sixth Circuit's criteria in *Reynolds v. Commissioner of Social Security*, which pertains to the adequacy of an ALJ's discussion of a relevant Listing.  (*See* Doc. 15 at 15–17) (citing 424 F. App'x 411 (6th Cir. Apr. 1, 2011)).  Remand based upon *Reynolds* is appropriate only "where the court's review of the ALJ's decision and the record evidence leaves open the possibility that a listing is met."  *Hoffmeyer v. Comm'r of Soc. Sec.*, No. 14-11690, 2015 WL 12670493, at *4 (E.D. Mich. Aug. 17, 2015), *report and recommendation adopted sub nom. Hoffmeyer v. Colvin*, No. 14-11690, 2015 WL 6735337 (E.D. Mich. Nov. 4, 2015) (citing *Reynolds*, 424 F. App'x at 416 ("[I]n this

case, correction of such an error is not merely a formalistic matter of procedure, for it is possible that the evidence [the plaintiff] put forth could meet this listing.")).  As established above, Plaintiff has failed to put forth evidence demonstrating that her impairments satisfy the *Reynolds* criteria.

In sum, substantial evidence supports the ALJ's conclusion that Plaintiff's impairments do not meet the requirements of Listing 1.04A.

## IV.    CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors (Doc. 15) and **AFFIRM** the Commissioner's decision.

## V.    PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed finding or recommendations to which objection is made, together with supporting authority for the objection(s).  A District Judge of this Court shall make a de novo determination of those portions of the Report or specific proposed findings or recommendations to which objection is made.  Upon proper objection, a District Judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the Magistrate Judge with instructions.  28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation de novo, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.


Date:  March 16, 2020

/s/ Kimberly A. Jolson
KIMBERLY A. JOLSON
UNITED STATES MAGISTRATE JUDGE